UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------------------------------ x

CHRISTOPHER DUNN,                                    :
                                                     :
                              Plaintiff,             :
                                                     :
            v.                                       :        24-CV-427 (SFR)
                                                     :
KERRIANN BELLUCCI-MAUS,                               :
CYNTHIA CARTIER,                                     :
THOMAS CROSBY and CROSBY LAW FIRM, LLC,               :
STEPHANIE BRETTMAN and WELLS FARGO BANK, N.A., :
                                                     :
                              Defendants.            :

------------------------------------------------------------------------ x

**<u>RULING ON PENDING MOTIONS</u>**

Self-represented Plaintiff Christopher Dunn brought this action against his former romantic partner Defendant Kerriann Bellucci-Maus to recover for what he describes as a baseless 2021 lawsuit brought by Bellucci-Maus against Dunn in Connecticut Superior Court. After the Superior Court returned a split verdict that ruled in large part for Dunn, Dunn sued Bellucci-Maus; her former attorney in family court, Defendant Cynthia Cartier; and Bellucci-Maus's trial attorney in Superior Court, Defendant Thomas Crosby (together with Crosby Law Firm LLC). Dunn also sued Defendant Stephanie Brettman, who testified as a witness in the Superior Court action, and Defendant Wells Fargo, Brettman's then-employer.

Dunn seeks to recover on the grounds that Defendants (both directly and through various theories of inchoate liability) engaged in vexatious litigation, abuse of process, fraud, defamation, intentional or negligent infliction of emotional distress, and intentional intrusion upon seclusion. Defendants have separately moved to dismiss Dunn's Third Amended Complaint. For the reasons that follow, Defendants' motions to dismiss are granted in part and

1

denied in part without prejudice to Dunn filing a Fourth Amended Complaint that addresses the deficiencies identified in this Opinion.

## I.    BACKGROUND

### A.    Factual Background

The Third Amended Complaint ("TAC"), ECF No. 46, alleges as follows. Dunn and Bellucci-Maus were in a romantic relationship for several months in 2003. TAC ¶ 17. During that time, Bellucci-Maus became pregnant. *Id.* Although Dunn and Bellucci-Maus ended their romantic relationship, they committed to co-parent their son and Dunn lived in a separate bedroom in Bellucci-Maus's home during extended periods between 2004 and 2009. *Id.* ¶¶ 19-32. In 2006, Dunn—who at the time was a part-time law student—lost his full-time job in telecommunications. *Id.* ¶ 32-33. Around that time, Bellucci-Maus agreed to co-sign several of Dunn's student loans. *Id.* ¶ 34. Dunn eventually graduated from law school in 2008, *id.* ¶ 36, but remained "devastated financially," *id.* ¶ 40.

#### 1.    The 2015 Agreement

Dunn's relationship with Bellucci-Maus deteriorated in conjunction with his financial difficulties. *Id.* ¶ 33. By winter 2009, Dunn was no longer living in Bellucci-Maus's house. *Id.* ¶¶ 32, 39. According to the TAC, Bellucci-Maus did not permit Dunn regular opportunities to be with their son during this period of time. *Id.* ¶ 43.

Dunn later passed the bar exam and in 2014 became a licensed attorney. *Id.* ¶¶ 44, 48. By 2014, Dunn was able to "clear up past debts," but he still owed over $200,000 in student loans. *Id.* ¶ 48. In 2015, Dunn and Bellucci-Maus negotiated "an agreement to address financial obligations between the parties." *Id.* ¶ 55. Dunn represented himself; Bellucci-Maus and her then-husband engaged counsel to negotiate the agreement. *Id.* ¶¶ 55-56. According to the TAC,

under the settlement agreement (hereinafter "2015 Agreement"), Dunn was required to make "minimal payments of $100.00 per month" to Bellucci-Maus. Dunn agreed to "compensate Ms. Bellucci-Maus up to a total of $120,000" unless his income from legal work and proceeds from other creative ventures did not yield the income Dunn hoped. *Id.* ¶ 58. The 2015 Agreement did not address child visitation rights, but Bellucci-Maus "assured Mr. Dunn verbally that she would not interfere with his visitation rights." *Id.* ¶ 59.

### 2.    2018 Family Court Appearance and the Pendente Lite Orders

Dunn says that Bellucci-Maus completely prevented him from seeing their son in the fall of 2018. *Id.* ¶ 67. Dunn filed a motion for visitation in New Haven Family Court. *Id.* ¶ 76. Bellucci-Maus responded by moving for child support payments. *Id.* ¶ 76. Dunn and Bellucci-Maus then attended a mediation before a family relations officer. *Id.* Bellucci-Maus was represented in this meeting by Defendant Cynthia Cartier. *Id.* ¶ 77. Dunn and Bellucci-Maus (through Cartier) negotiated an agreement, labeled as the "Pendente Lite Orders." *Id.* ¶ 77. The Pendente Lite Orders provide as follows[1]:

> The Plaintiff agrees to pay child support in the amount of $72.00 par week. The plaintiff is responsible for 24 percent of unreimbursed medical expenses and the defendant 76 percent.
>
> The father agrees that he will be responsible for the student loan through Naviant in the amount of $72,000 or the current amount as of November 29, 2018. Should the plaintiff be able to refinance the defendant will cooperate with the

---

[1] The Pendente Lite Orders are described in but not attached to the TAC. *See* TAC ¶ 77. Nonetheless, courts may look beyond the pleadings to consider a fact that is subject to judicial notice or is contained within a document that is integral to the complaint. *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998); *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991). The Pendente Lite Orders are integral to the complaint; I can also take judicial notice of the Pendente Lite Orders because they are described in full in the Memorandum of Decision of the Connecticut Superior Court. *Bellucci v. Dunn*, No. NNH CV21-6117238 S, 2023 WL 7381560, at *1-2 (Conn. Super. Ct. Oct. 30, 2023).

process. The plaintiff will hold the defendant harmless of all expenses and debt pertaining to this said loan.

The defendant agrees that she will check the minor child's cell phone to make sure the plaintiff's phone number is not blocked. Should it be blocked, she agrees to unblock the number.

*Bellucci v. Dunn*, No. NNH CV21-6117238 S, 2023 WL 7381560, at *1-2 (Conn. Super. Ct. Oct. 30, 2023).

Prior to signing the Pendente Lite Orders, Dunn sought to confirm that the Pendente Lite Orders would replace the 2015 Agreement. TAC ¶ 78. Cartier and Bellucci-Maus contended there was no such agreement. *Id.* ¶ 78. Bellucci-Maus said: "He doesn't pay anything. There is no agreement." *Id.* ¶ 79. After Dunn produced the 2015 Agreement, Cartier reversed course and advised Bellucci-Maus that she should nullify the 2015 Agreement and replace it with the Pendente Lite Orders. *Id.* ¶¶ 79-82. Bellucci-Maus then agreed to nullify the 2015 Agreement. *Id.* ¶ 82. Bellucci-Maus demonstrated her intent to nullify the 2015 Agreement by affixing her signature to a handwritten statement that "The parties agree on November 29, 2018 that this agreement is null and void." *Bellucci*, 2023 WL 7381560, at *2.[2] Dunn also signed to demonstrate his agreement to nullify the 2015 Agreement. *Id.* Cartier initialed next to Bellucci-Maus's signature. TAC ¶¶ 82, 85.

The Pendente Lite Orders remained in effect until November 2019. *Id.* ¶ 119. Dunn performed his obligations under the Pendente Lite Orders by paying $288 per month in child support to Bellucci-Maus. *Id.* ¶ 116. Dunn continued to make these monthly payments until

---

[2] The TAC does not clearly describe this sequence of events, but I take judicial notice of the evidence that Dunn introduced in the Superior Court action as described in the Superior Court's Memorandum of Decision to the extent it clarifies the sequence of events surrounding the disputed nullification of the 2015 Agreement.

March 2022. *Id.* ¶ 120. Nonetheless, Dunn says that he had no direct contact with Bellucci-Maus and that Bellucci-Maus, through Cartier, denied Dunn's requests for visitation with their son. *Id.* ¶¶ 111-17. During this time, Bellucci-Maus never asserted that Dunn had breached the Pendente Lite Orders or the 2015 Agreement. *Id.* ¶ 125.

Even though Dunn had agreed in the Pendente Lite Orders to pay 24 percent of their son's unreimbursed medical expenses, the TAC asserts that Bellucci-Maus never disclosed or sought reimbursement from Dunn for their son's medical care. *Id.* ¶ 132. Indeed, the TAC contends that Dunn was "intentionally kept in the dark about any medical needs and bills for their son" by Bellucci-Maus. *Id.* ¶ 133.

### 3.     Bellucci-Maus's Efforts to Refinance

In June of 2021, Bellucci-Maus called Dunn to alert him that she planned to refinance her home. *Id.* ¶ 181. Bellucci-Maus told Dunn that he would be contacted by Defendant Stephanie Brettman from Wells Fargo. *Id.* Brettman spoke with Dunn the following day and asked that Dunn share 12 months of bank statements so she could "exclude co-signed loan payments from Ms. Bellucci-Maus's debt ratios." *Id.* ¶ 182. Dunn agreed to share the statements on the condition that Brettman "not . . . shar[e] the information with Ms. Bellucci-Maus." *Id.* Dunn also asked that Brettman confirm this assurance in writing. *Id.* Brettman followed up at least twice to secure Dunn's bank statements, but Dunn declined to provide his statements after Brettman failed to provide written assurances that these would not be shared with Bellucci-Maus. *Id.* ¶¶ 184-94. Dunn also asked to speak to Brettman's supervisor; Brettman provided her supervisor's contact information only after telling Dunn that Bellucci-Maus's loan application had been denied. *Id.* ¶ 197.

Dunn accuses Brettman of misrepresenting these interactions in her contemporaneous text messages about him to Bellucci-Maus. *Id.* ¶ 200. In particular, Dunn says that Brettman wrote to Bellucci-Maus that she should "refinance those loans ASAP, as [Dunn] makes enough income to do so." *Id.* ¶ 201. Dunn says "on information and belief" that this text message "reveals that Ms. Brettman had visibility into how much money Mr. Dunn had in his account" and Brettman "improperly accessed Mr. Dunn's bank account balance and improperly revealed such information to Ms. Bellucci-Maus." *Id.* ¶ 202.

### 4.    Superior Court Proceedings

Bellucci-Maus sued Dunn in Connecticut Superior Court in September of 2021. *Id.* ¶ 122. Bellucci-Maus retained Defendant Thomas Crosby to represent her. *Id.* ¶ 127. The Superior Court described Bellucci-Maus's six-count complaint as follows:

> Count One claims breach of contract, alleging a balance due on the Settlement Agreement. Count Two claims unjust enrichment resulting from Bellucci's payments on Dunn's educational loans. Count Three, arising out of the same payments, claims conversion. Count Four, again arising out of the same payments, claims treble damages for theft pursuant to Conn. Gen. Stat. § 52-564. Count Five claims a breach of the 2018 Pendente Lite Orders, both with respect to [their son's] unreimbursed medical expenses and with respect to Dunn's alleged failure to cooperate with Bellucci's 2021 refinancing. Count Six claims tortious interference with Bellucci's contractual rights arising from Dunn's alleged failure to cooperate with the 2021 refinancing.

*Bellucci*, 2023 WL 7381560, at *2. Bellucci-Maus's claims were tried to a bench trial. *See id.*. The TAC avers that Bellucci-Maus testified falsely in Superior Court that she never signed to nullify the 2015 Agreement. TAC ¶ 155. Cartier corroborated this false version of events, stating in her testimony that she "would never tell [Bellucci-Maus] to nullify that agreement." *Id.* ¶ 158. The TAC further asserts that Crosby knew or should have known that Bellucci-Maus and Cartier's testimony was false. *Id.* ¶¶ 165-69.

The TAC also asserts that Cartier and Bellucci-Maus provided misleading or false testimony concerning Dunn's obligation to pay medical bills for his son. Cartier testified that she would provide emails demonstrating when she had transmitted bills to Dunn so that Dunn could reimburse Bellucci-Maus for his portion, only to later explain that her emails from that time had been erased. *Id.* ¶ 140. Bellucci-Maus in turn testified that she had provided the expenses to Cartier to transmit to Dunn. *Id.* ¶ 143. But the TAC maintains that Dunn never received any medical bills from Bellucci-Maus or from Cartier. *Id.* ¶ 133. Finally, the TAC contends that Brettman provided false testimony regarding her interactions with Dunn in connection with Bellucci-Maus's effort to refinance her home. *Id.* ¶ 354.

The Superior Court began by addressing whether the 2015 Agreement had been nullified by Bellucci-Maus. The Court considered Dunn's testimony that Bellucci-Maus nullified the 2015 Agreement, Bellucci-Maus's testimony that her signature on the 2015 Agreement was not her own, as well as dueling reports from handwriting experts. *Bellucci*, 2023 WL 7381560, at *2. The Court concluded that Bellucci-Maus had indeed signed to nullify the 2015 Agreement, writing:

> After a careful consideration of the evidence, I find that the signature following the Nullification Agreement is, indeed, the authentic signature of Bellucci. The most important factor underlying the court's finding is the remarkable similarity of the signature (purporting to be Bellucci's) on Ex. J to the (admitted) signature of Bellucci on the Pendente Lite Orders executed on the same day (Ex. 6). These two signatures are so utterly similar (although not identical) that it is doubtful that even a master forger could have forged the signature of Bellucci on Ex. J. Given this powerful physical evidence, Dunn has proven that the Nullification Agreement was signed by both parties on November 29, 2018.

*Bellucci*, 2023 WL 7381560, at *2.

As a result, the Court found that Bellucci-Maus could not prevail on her claims premised on a breach of the nullified 2015 Agreement. *Id.* at *3. The Court also found that

Bellucci-Maus had not proven her claim of conversion or statutory theft. *Id.* at *4-5. And the Court rejected Bellucci-Maus's claims that Dunn violated the Pendente Lite Orders or tortiously interfered with contractual rights by failing to respond to Brettman's requests for his bank statements. *Id.* at *5. The Court reasoned that the Pendente Lite Orders lapsed in 2019 such that Dunn owed "no common law duty to assist [Bellucci-Maus] in her quest to refinance her home" in 2021. *Id.*

Nonetheless, the Court found that Bellucci-Maus was entitled to recover on her claim of unjust enrichment relating to Bellucci-Maus's payments on Dunn's student loans. *Id.* at *3. The Court accordingly awarded judgment in favor of Bellucci-Maus in the "net amount of $30,484.09." *Id.* at *4.

Dunn appealed the Superior Court judgment as to the unjust enrichment claim. The Appellate Court affirmed, and the Connecticut Supreme Court denied Dunn's petition for a writ of certiorari. *Bellucci v. Dunn*, 232 Conn. App. 904, *cert. denied*, 352 Conn. 911 (2025).

## B.    Procedural History

I state here only the details that are necessary to contextualize the Motions to Dismiss and Fourth Motion to Amend presently before me.

Dunn, a licensed attorney representing himself in this action,[3] filed a Complaint on June 2, 2024. ECF No. 1. Dunn subsequently amended once as of right, ECF No. 13, and a second time by leave of the Court,[4] ECF No. 26. Defendants timely filed Motions to Dismiss the

---

[3] Courts owe a duty of special solicitude to *pro se* litigants. *See Rosa v. Doe*, 86 F.4th 1001, 1007 (2d Cir. 2023). But "a lawyer representing himself ordinarily receives no such solicitude at all." *Tracy v. Freshwater*, 623 F.3d 90, 102 (2d Cir. 2010).

[4] The Honorable Michael P. Shea, Chief United States District Judge, presided over this action until it was transferred to me on January 6, 2025. ECF No. 82.

Second Amended Complaint. ECF Nos. 31, 32, 33, 34. The Court permitted Dunn to amend once again "to address the alleged defects discussed in the defendants' memoranda of law." ECF No. 35. The Court warned that it would "not allow further amendments after August 27, 2024." *Id.*

The Court also granted, over Dunn's objection, Defendants' Motion to Stay Discovery until the Court ruled on the Motions to Dismiss. ECF No. 41.[5] After a scheduling conference, on September 18, 2024, the Court[6] issued a scheduling order governing the action in the event the Court permitted any of Dunn's claims to proceed to discovery. ECF No. 59.

Dunn filed a Third Amended Complaint on August 27, 2024. Third Am. Compl. ("TAC"), ECF No. 46. In light of this new filing, the Court found that Defendants' prior motions to dismiss were moot. ECF No. 49. Defendants timely filed four separate motions to dismiss and accompanying memoranda of law. Def. Crosby & Crosby Law Firm LLC's Mot. to Dismiss and/or Mot. to Strike ("Crosby's Mem."), ECF No. 55; Def. Kerriann Bellucci-Maus's Mem. of L. in Supp. of Mot. to Dismiss and/or Mot. to Strike Pl.'s Third Am. Compl. ("Bellucci-Maus's Mem."), ECF No. 57-1; Def. Cynthia Cartier's Mem. of L. in Supp. of Her Mot. to Dismiss ("Cartier's Mem."), ECF No. 60-1; Mem. of L. in Supp. of Mot. to Dismiss Third Am. Compl. on Behalf of Defs. Stephanie Brettman & Wells Fargo Bank, N.A.

---

[5] The Court stated: "The 38 motion to stay discovery is GRANTED, because (1) the defendants' motions to dismiss raise non-frivolous arguments for dismissing at least some of the claims in the plaintiff's complaint, (2) conducting discovery on all claims at this point will be burdensome and potentially wasteful, given the length and complexity of the complaint, and (3) the plaintiff is unlikely to be prejudiced by the delay, given that the deadlines the plaintiff has requested in the 26(f) report are generally based upon the date the court rules on the motions to dismiss and/or strike." ECF No. 41.

[6] Upon referral from Chief Judge Shea, the Honorable Robert A. Richardson, United States Magistrate Judge, conducted a scheduling conference and issued a scheduling order. ECF No. 42.

("Brettman & Wells Fargo's Mem."), ECF No. 61-1. Dunn responded separately to all four Motions to Dismiss.[7] Pl.'s Mem. of L. in Opp. to Defs. Crosby & Crosby Law Firm, LLC's Mot. to Dismiss & Mot. to Strike Pl.'s Third Am. Compl. ("Pl.'s Resp. re: Crosby"), ECF No. 63; Pl.'s Mem. of L. in Opp. to Def. Bellucci-Maus's Mot. to Dismiss and/or Mot. to Strike Pl.'s Third Am. Compl. ("Pl.'s Resp. re: Bellucci-Maus"), ECF No. 64; Pl.'s Mem. of L. in Opp. to Def. Cartier's Mot. to Dismiss Pl.'s Third Am. Compl. ("Pl.'s Resp. re: Cartier"), ECF No. 74-1; Pl.'s Opp. to Def. Brettman's & Wells Fargo Bank, N.A.'s Mot to Dismiss and/or Mot. to Strike Pl.'s Third Am. Compl. ("Pl.'s Resp. re: Brettman & Wells Fargo"), ECF No. 75-1.

Defendants (with the exception of Bellucci-Maus), filed optional replies in support of dismissal. Defs. Crosby & Crosby Law Firm LLC's Reply Br. in Further Support of their Mot. to Dismiss and/or Mot. to Strike ("Crosby's Reply"), ECF No. 73; Def. Cartier's Reply to Pl.'s Obj. to Mot. to Dismiss & in Further Supp. of her Mot. to Dismiss ("Cartier's Reply"), ECF No. 76; Reply to Pl.'s Opp. to Mot. to Dismiss Third Am. Compl. on Behalf of Defs. Brettman & Wells Fargo Bank, N.A. ("Brettman & Wells Fargo's Reply"), ECF No. 77.

On November 15, 2024, Dunn filed a notice of additional authority relating to the results of attorney disciplinary proceedings against Cartier. ECF No. 79. Cartier moved to strike that notice on November 25, 2024. ECF No. 80. Dunn objected on November 27, 2024. ECF No. 81. I denied the motion to strike on April 19, 2025, noting that a Rule 12(f) motion to strike is properly directed at the pleadings, not a notice of additional authority. ECF No. 83.

---

[7] All page numbers cited within this Opinion refer to the pagination set by ECF, rather than any internal numbering system used in some of the briefs.

On August 5, 2025, Dunn moved for leave to file an amended complaint, together with a proposed Fourth Amended Complaint and memorandum of law. Mem. of L. in Supp. of Mot. for Leave to File Fourth Am. Compl. ("Pl.'s Mem. re: Am. Compl."), ECF No. 84-1. Defendants timely responded in opposition. ECF Nos. 85, 86, 87, 88. Dunn filed separate replies to each defendant's objection. ECF Nos. 89, 90, 91, and 92.

## II.   <u>LEGAL STANDARD</u>

To survive a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018); *Lapaglia v. Transamerica Cas. Ins. Co.*, 155 F. Supp. 3d 153, 155-56 (D. Conn. 2016). Although this "plausibility" requirement is "not akin to a probability requirement," it "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. The court must "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011). However, the court is not bound to accept "conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008).

## III.   <u>DISCUSSION</u>

At the outset, I note that the TAC, which spans 133 pages and more than 500 numbered paragraphs, only arguably complies with the requirement that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although Crosby and Bellucci-Maus contend that the TAC should be stricken because

of its prolix nature, I am able to discern from this record the substance of Dunn's allegations. *Cf. Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) (noting that dismissal for failure to comply with Rule 8 "is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised").

I separately address Dunn's claims of (1) vexatious litigation, (2) abuse of process, (3) fraud, (4) negligent and intentional infliction of emotional distress, and (5) intrusion upon seclusion. I conclude by denying Dunn's motion to file a Fourth Amended Complaint that brings new claims, but will permit Dunn to amend one further time to respond to the defects in the TAC identified in this Opinion.

## A.    Vexatious Litigation

Counts 1, 2, 3, 4, 5, 6, 16, 17, 18, 19, 20, 21, 22, 23, 24, and 25 of the TAC assert that Defendants—either directly or via various theories of inchoate liability—committed the common law tort of vexatious litigation and its statutory analogue, Conn. Gen. Stat. § 52-568.

In Connecticut, there exists both a statutory and common law cause of action for vexatious litigation. *Bernhardt-Thomas Building Systems, LLC v. Dunican*, 286 Conn. 548, 554 (2008). Both require the plaintiff to prove "that a civil action has been prosecuted." *QSP, Inc. v. Aetna Cas. & Surety Co.*, 256 Conn. 343, 361 (Conn. 2001). Both also require a plaintiff to prove "want of probable cause, malice and a termination of suit in the plaintiff's favor." *Falls Church Group, Ltd. v. Tyler, Cooper & Alcorn, LLP*, 281 Conn. 84, 94 (2007). The key distinction is that, under the statutory cause of action, Conn. Gen. Stat. § 52-568, "a finding of malice is not an essential element, but will serve as a basis for higher damages." *Id.*

Defendants contend that the Superior Court action did not terminate in Dunn's favor because Bellucci-Maus recovered on the unjust enrichment claim, which proves conclusively

that the action was brought with probable cause. Dunn responds that he can still recover because Bellucci-Maus's five other causes of action were rejected by the Superior Court. The Connecticut Supreme Court has held that a plaintiff may recover for vexatious litigation where only a subset of the causes of action in the underlying case lacked probable cause. *DeLaurentis v. City of New Haven*, 220 Conn. 225, 256 (1991). The plaintiff may recover by "proving that one or more logically severable claims were brought without probable cause." *Tatoian v. Tyler*, 194 Conn. App. 1, 55 (2019); *accord Econ. Petroleum Corp. v. Paulasukas*, No. CV000822116S, 2003 WL 22007018, at *13 (Conn. Super. Ct. Aug. 1, 2003). A claim is "logically severable" from the claim that did not terminate favorably—i.e., the claim that was brought with probable cause—when it seeks to recover on the basis of "factual allegations with respect to different times, occurrences and actions." *DeLaurentis*, 220 Conn. at 255. For example, in *Tatoian*, the Connecticut Appellate Court analyzed whether a claim that a trustee failed to act as a prudent investor of trust assets was logically severable from a separate claim that the trustee failed to furnish the beneficiaries with trust accountings. 194 Conn. App. at 53-56. The Appellate Court concluded the claims were logically severable because they required analysis of distinct factual allegations. *Id.* at 56.

It is apparent that only some of Bellucci-Maus's claims against Dunn in the Superior Court action are "logically severable" from the unjust enrichment claim brought with probable cause. The Superior Court described count three, for conversion, and count four, for statutory theft, as "arising out of the same payments" that Bellucci-Maus made on Dunn's student loans. *Bellucci*, 2023 WL 7381560, at *2. Although these claims were premised on different (and ultimately unsuccessful) legal theories, they focused on the same factual allegations that the Superior Court found meritorious: that Bellucci-Maus had been unjustly required to make

more than $30,000 in Dunn's student loan payments. As these claims are not logically severable from the claim that was brought with probable cause, I conclude that Dunn cannot recover on the basis of Bellucci-Maus and Crosby's decision to sue him for statutory theft and conversion.

But I agree that Bellucci-Maus's other causes of action—for breach of contract on the 2015 Agreement, breach of contract on the Pendente Lite Orders, and tortious interference with contractual relationships—are logically severable from the successful unjust enrichment claim. Each of these three causes of action strayed far from the narrow issue of whether Dunn owed Bellucci-Maus for payments on his student loans. Rather, these factually and logically distinct claims focused on (1) whether the 2015 Agreement remained enforceable and (2) whether Bellucci-Maus could recover following Dunn's refusal to provide bank statements that would assist in her efforts to refinance her home. Consequently, I find that Bellucci-Maus's recovery on the unjust enrichment claim does not foreclose Dunn's effort to recover for vexatious litigation concerning the breach of contract, breach of the Pendente Lite Orders, and tortious interference claims in the Superior Court action.

I therefore proceed to consider whether Dunn has plausibly pleaded that Bellucci-Maus and Crosby brought these logically severable causes of action without probable cause. To prove lack of probable cause, a plaintiff must do more than show that they prevailed on the merits in defending a claim in the underlying action. *See Falls Church*, 281 Conn. at 103. "Probable cause is the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of. Thus, in the context of a vexatious suit action, the defendant lacks probable cause if he lacks a reasonable, good faith belief in the facts alleged and the validity

of the claim asserted." *Falls Church*, 281 Conn. at 95. "The lower threshold of probable cause allows attorneys and litigants to present issues that are arguably correct, even if it is extremely unlikely that they will win." *Id.* at 103-04 (citation and internal quotation marks omitted). This standard applies to litigants and to attorneys retained to litigate on behalf of their clients. *See id.* at 100 ("Additionally, we can find no persuasive rationale in the case law from other jurisdictions to distinguish between the probable cause test applied to attorneys who bring actions on behalf of clients and the test applied to the clients themselves.").

### 1.    Breach of Contract Claim

Dunn asserts he has plausibly pleaded a claim of vexatious litigation with regards to Bellucci-Maus and Crosby's decision to sue for breach of contract on the 2015 Agreement. Pl.'s Resp. re: Crosby 21; Pl.'s Resp. re: Bellucci-Maus 21-23. Defendants do not address this claim beyond stating that the underlying action did not fully terminate in Dunn's favor. *See* Crosby's Mem. 14-16; Bellucci-Maus's Mem. 12-14. The TAC contends that Bellucci-Maus sought to enforce an agreement that she had in fact signed to nullify. TAC ¶¶ 127, 152-77. Thus, according to the TAC, Bellucci-Maus asserted in the state court lawsuit that she never nullified the Settlement Agreement without a reasonable, good faith belief in this critical fact. Drawing all permissible inferences in Dunn's favor, Dunn plausibly asserts that Bellucci-Maus lacked probable cause to sue for breach of the 2015 Agreement. TAC ¶¶ 127, 152-77. Furthermore, Dunn plausibly asserts that Crosby lacked a good faith basis to challenge the validity of Bellucci-Maus's signature on the 2015 Agreement but nonetheless maintained in the Superior Court action that the 2015 Agreement remained valid. *Id.* ¶¶ 164-77. These allegations adequately state a claim of vexatious litigation against Bellucci-Maus and Crosby.

The TAC also adequately pleads that Bellucci-Maus and Crosby brought this cause of action with malice. *See Falls Church*, 281 Conn. at 94 ("Malice may be inferred from lack of probable cause.").

### 2.     Breach of Pendente Lite Orders and Tortious Interference Claims

In contrast, however, the TAC does not state a claim for vexatious litigation with regard to Bellucci-Maus and Crosby's decisions to sue for breach of the Pendente Lite Orders and tortious interference with contractual relations. The breach of contract claim contended that Dunn breached the Pendente Lite Orders' requirement that he cooperate with any effort by Bellucci-Maus to refinance her debt; it also asserted that Dunn had failed to reimburse Bellucci-Maus for their son's medical care between 2018 and 2021. The tortious interference claim, in contrast, asserted that Dunn breached a duty to Bellucci-Maus by failing to provide his financial statements when he was contacted by Brettman, who was evaluating Bellucci-Maus's application to refinance her home.

Dunn asserts that Defendants had information available to them that undermined the validity of these claims, claiming that Crosby should have known "something was awry" because of the "noticeable lack" of dates in the texts between Ms. Bellucci-Maus and Ms. Brettman and the fact "that there were missing portions of the conversations provided to him by Ms. Bellucci-Maus." TAC ¶ 208. But these conclusory allegations do not plausibly allege that Defendants lacked a reasonable, good faith belief in the facts necessary to make out these claims.

Instead, it is clear that Bellucci-Maus failed to recover on these claims because of structural legal impediments to recovery rather than because the Superior Court rejected the factual account of Dunn's interactions with Brettman. *See Bellucci*, 2023 WL 7381560, at *5.

These structural impediments included that (1) the Pendente Lite Orders lapsed in 2019, well before Bellucci-Maus applied to refinance her debt, and (2) Dunn was under no contractual or common law duty to assist in Bellucci-Maus's refinance efforts. *Id.* Even though the legal theories animating these two claims were quickly rejected by the Superior Court, Dunn has not alleged—as he must—that Defendants lacked any good faith basis for pursuing these legal theories. *Cf. Falls Church*, 281 Conn. at 104 (noting approvingly that "[t]he vitality of our common law system is dependent upon the freedom of attorneys to pursue novel, although potentially unsuccessful legal theories").

### 3.    Theories of Inchoate Liability

Counts 1-6 are asserted directly against Bellucci-Maus and Crosby. Counts 16-19 allege that Defendants conspired to engage in vexatious litigation. Counts 15 and 20 asserts that Wells Fargo is vicariously liable for Brettman's conspiracy to engage in vexatious litigation. Counts 21-24 allege that Defendants aided and abetted vexatious litigation. Count 25 asserts that Wells Fargo is vicariously liable for Brettman's aiding and abetting.

One who aids and abets another in committing a tort is independently liable under Connecticut law. *See Carney v. DeWees*, 136 Conn. 256, 262 (1949). Aiding and abetting includes the following elements: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) [and] the defendant must knowingly and substantially assist the principal violation." *Efthimious v. Smith*, 268 Conn. 499, 505 (2004).

Under Connecticut law, "[t]he elements of a civil action for conspiracy are: (1) a combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful

act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object, (4) which act results in damage to the plaintiff." *Harp v. King*, 266 Conn. 747, 779 (2003). As the Connecticut Supreme Court has recognized, however, there is "no independent claim of civil conspiracy," but instead "the action is for damages caused by acts committed pursuant to a formed conspiracy rather than by the conspiracy itself." *Macomber v. Travelers Prop. & Cas. Corp.*, 277 Conn. 617, 636 (2006). "Thus, to state a cause of action, a claim of civil conspiracy must be joined with an allegation of a substantive tort." *Id.*

### a.    Claims Against Brettman and Wells Fargo

Counts 18, 20, 23, and 25 fail because, for the reasons stated above, Dunn has not plausibly alleged a tort of vexatious litigation relating to Brettman's testimony concerning her interactions with him in 2021, which was relevant to the claims of tortious interference with contractual relationships and breach of the Pendente Lite Orders.[8] As Dunn has not pleaded a claim of vexatious litigation with regard to this cause of action, the conspiracy and aiding and abetting claims against Brettman also fail. *See Sarner v. Caldwell-Boyd*, No. 3:21-CV-987 (JAM), 2022 WL 4132940, at *9 (D. Conn. Sept. 12, 2022). Since the claim against Brettman fails, claims 20, 23, and 25 which asserts that Wells Fargo is vicariously liable for Brettman, must also fail.

---

[8] Furthermore, Dunn does not include any non-conclusory facts to suggest that Brettman was in any way aware of any agreement between the other Defendants to bring a vexatious suit against Dunn.

### b.    Claims Against Crosby, Bellucci-Maus, and Cartier

In their briefing, Defendants do not provide a reason to dismiss the aiding and abetting or conspiracy claims against them beyond stating that dismissal is appropriate because the claims in the underlying suit were brought with probable cause. But as I have already found that Dunn has adequately pleaded that the breach of contract claim was brought without probable cause, I deny Defendants' motions to dismiss the inchoate liability claims brought against Crosby, Bellucci-Maus, and Cartier.[9]

### 4.    Surviving Vexatious Litigation Claims

Accordingly, for the reasons stated above, Defendants' motions to dismiss counts 1-6 are denied insofar as Dunn has stated a claim for vexatious litigation for Defendants' decision to sue for breach of contract on the 2015 Agreement. But the motions to dismiss are granted to the extent that Dunn has not demonstrated that any of the other claims pursued in the Superior Court action were brought without probable cause. This dismissal is without prejudice to the filing of an amended complaint.

Defendants' motions to dismiss counts 16, 17, 19, 21, 22, and 24 are denied. Counts 18, 20, and 23, are dismissed with prejudice and without leave to amend.

### B.    Abuse of Process

Counts 7 and 8 allege that Crosby and Bellucci-Maus committed the tort of abuse of process. "While malicious prosecution concerns the improper issuance of process, the gist of

---

[9] In particular, I note that the TAC plausibly pleads that Cartier is liable for conspiring or aiding and abetting vexatious litigation in that the TAC pleads that Cartier knew the cause of action for breach of contract on the nullified 2015 Settlement was brought without probable cause and she advanced this action through her false testimony. I note further that Cartier has not asserted that the litigation privilege shields her from liability from these inchoate theories of liability for vexatious litigation. *See* Cartier's Mem. 19-22.

abuse of process is the improper use of process after it is regularly issued." *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir.1994) (citation omitted). "An action for abuse of process lies against any person using a legal process against another in an improper manner or to accomplish a purpose for which it was not designed." *Larobina v. McDonald,* 274 Conn. 394, 403 (2005) (internal quotation omitted). "[T]he gravamen of the action for abuse of process is the use of a legal process . . . against another *primarily* to accomplish a purpose for which it is not designed." *Id.* (quoting Restatement (Second) of Torts § 682 (1977)). Examples of improper purposes include: "(i) using the pleadings as leverage to coerce the payment of a debt or surrendering of property unrelated to the litigation; (ii) using unreasonable force, excessive attachment or extortionate methods to enforce a right of action; or (iii) using the process to gain a collateral advantage extraneous to the merits, e.g., improper use of a subpoena." *Doctor's Assocs., Inc. v. Weible,* 92 F.3d 108, 114 (2d Cir. 1996) (citations omitted). Thus, an abuse of process claim survives a motion to dismiss if it asserts that an underlying action was brought for the primary purpose of intimidating or terrorizing a party. *Lezak v. Apex Int'l Educ. Partners*, No. HHDCV206131252S, 2021 WL 1410926, at *4 (Conn. Super. Ct. Feb. 24, 2021). In contrast, an abuse of process claim should be dismissed where it merely alleges that one of several purposes animating the defendants' decision to bring a lawsuit was the desire to "inflict injury upon the plaintiff and to enrich themselves." *Mozzochi v. Beck*, 204 Conn. 490, 493-98 (1987).

Although Crosby contends otherwise, *see* Crosby's Mem. 16-19, "attorneys are not protected by absolute immunity against claims for abuse of process." *Scholz v. Epstein*, 341 Conn. 1, 10 (2021). Nonetheless, I agree with Crosby and Bellucci-Maus that the TAC does not plausibly state a claim of abuse of process. Dunn objects to the decision to sue him based

on legal and factual theories that ultimately proved unavailing in the Superior Court. But he does not point to any instance where Crosby or Bellucci-Maus used the legal process for a purpose it was not designed. Although Dunn contends that these defendants "sought to elevate in the eyes of their son and others [Bellucci-Maus's] righteousness and her view of the flaws of Plaintiff Dunn," I am not required to credit these conclusory allegations. Pl.'s Mem. re: Crosby 25. And Dunn's specific allegations about the unpleasant manner in which he was cross-examined or deposed before trial, *see* TAC ¶¶ 260-65, do not suggest that Crosby or Bellucci-Maus sought to use the legal process to "cause specific injury outside of the normal contemplation of private litigation." *Mozzochi*, 204 Conn. at 497. Instead, the TAC relates that Bellucci-Maus, with the assistance of counsel, sought to recover money damages from Dunn. Whatever the merits of the positions taken by Crosby and Bellucci-Maus in the Superior Court action, this type of conduct does not state a claim of abuse of process.

I therefore dismiss claims 7 and 8 with prejudice and without leave to amend.

## C.    Fraud

Count 9-15, 26-27, and 40 assert that Defendants—directly, vicariously, or as conspirators or accomplices—committed fraud. For the reasons that follow, I find that all of these charges fail to state a claim upon which relief can be granted.

### 1.    Claims Against Bellucci-Maus and Cartier

Count 9 asserts that Bellucci-Maus "intended to deceive Plaintiff to further her own interests." TAC ¶ 285. In particular, Dunn claims that Bellucci-Maus misrepresented her intentions by stating in 2018 at the meeting where the Pendente Lite Orders were negotiated that she would nullify the 2015 Agreement, only to invoke the 2015 Agreement in the Superior Court action. *Id.* ¶¶ 276-87. Dunn also contends that Bellucci-Maus intentionally "concealed

medical treatment and the associated bills for medical treatment, not revealing them until moving forward with a litigation." *Id.* ¶ 282. Count 11 claims that Cartier defrauded Dunn by misrepresenting Bellucci-Maus's intentions at the 2018 meeting where the Pendente Lite Orders were signed. *Id.* ¶¶ 294-302. Counts 12, 13, and 26 recast counts 9 and 11 as conspiracy and aiding-and-abetting claims. *Id.* ¶¶ 303-18.

These fraud claims against Bellucci-Maus and Cartier are barred by the litigation privilege. The Connecticut Supreme Court "has established a rule of 'absolute immunity,'" also referred to as the "litigation privilege," which "protects the statements or actions that any individual makes, in the context of a judicial proceeding, from giving rise to most types of tort claims." *Costello v. Wells Fargo Bank Nat'l Ass'n*, No. 16-CV-1706 (VAB), 2017 WL 3262157, at *14 (D. Conn. July 31, 2017) (citing *MacDermid, Inc. v. Leonetti*, 310 Conn. 616, 627, 79 A.3d 60 (2013)), *aff'd*, 739 F. App'x 77 (2d Cir. 2018) (summary order). "Federal courts in Connecticut routinely apply the state's litigation privilege to claims that challenge representations made in underlying state court litigation." *Weldon v. MTAG Servs., LLC*, No. 3:16-CV-783 (JCH), 2017 WL 776648, at *10 (D. Conn. Feb. 28, 2017) (collecting cases).

"[C]ommunications uttered or published in the course of judicial proceedings are absolutely privileged so long as they are in some way pertinent to the subject of the controversy." *Hopkins v. O'Connor*, 282 Conn. 821, 830-31 (2007) (citation and internal quotation marks omitted). "There is no requirement under Connecticut jurisprudence that to be considered part of a judicial proceeding, statements must be made in a courtroom or under oath or be contained in a pleading or other documents submitted to the court." *Kenneson v. Eggert*, 196 Conn. App. 773, 783 (2020). Rather, a judicial proceeding includes "every step of the proceeding until its final disposition." *Scholz v. Epstein*, 341 Conn. 1, 29-30 (2021). If a

court determines that a statement was made in a "judicial proceeding," the litigation privilege applies so long as the communications are "in some way pertinent to the subject of the controversy." *Id.* at 19. "[A]bsolute immunity extends to an array of retaliatory civil actions beyond claims of defamation, including intentional interference with contractual or beneficial relations arising from statements made during a civil action, intentional infliction of emotional distress arising from statements made during judicial proceedings, and fraud against attorneys or party opponents for their actions during litigation." *Dorfman v. Smith*, 342 Conn. 582, 592 (2022).

Dunn's first theory of fraud is that Bellucci-Maus and Cartier testified falsely in the Superior Court action. But this is squarely foreclosed by the litigation privilege, which unquestionably immunizes statements made by a testifying witness. *Rioux v. Barry*, 283 Conn. 338, 343 (2007) ("The doctrine of absolute immunity as applied to statements made in the context of judicial and quasi-judicial proceedings is rooted in the public policy of encouraging witnesses, both complaining and testimonial, to come forward and testify in either criminal or civil actions."). Dunn also seeks to recover on the basis of Bellucci-Maus and Cartier's statements (or omissions) during the 2018 meeting with a family relations officer where they negotiated the Pendente Lite Orders. The TAC avers that Bellucci-Maus misled him about her true intentions regarding the 2015 Agreement. TAC ¶¶ 277-81. The TAC maintains that Bellucci-Maus went back on the promise she made during the meeting with the family relations officer to inform Dunn of their son's medical needs so that Dunn could contribute his share. *Id.* ¶¶ 282-87. The Connecticut Appellate Court has previously held that settlement discussions are a "judicial proceeding" for purposes of the litigation privilege. *Kenneson*, 196 Conn. App. at 783; *accord Davis v. Lapish*, No. 3:17-cv-898 (MPS), 2019 WL 5964792, at *2 (D. Conn.

Nov. 13, 2019) (concluding that settlement conference before magistrate judge is a judicial proceeding); *Ghio v. Liberty Ins. Underwriters, Inc.*, No. X07HHDCV196104759S, 2019 WL 2142830, at *1 (Conn. Super. Ct. Apr. 12, 2019) (same). Thus, the meeting before a family relations officer attended by Dunn, Bellucci-Maus, and Cartier where they settled their respective claims in lieu of appearing before a family court judge was a "judicial proceeding." As all of the communications were pertinent to the controversy between Dunn and Bellucci-Maus, any statements by Bellucci-Maus and Cartier made during those proceedings cannot form the basis of an action for fraud.

As I find that any further amendment would be futile with regard to these claims, counts 9, 11, 12, 13, and 26 are dismissed with prejudice.

### 2.    Claims Against Brettman and Wells Fargo

Count 10 asserts that Brettman defrauded Dunn by providing false assurances to Dunn regarding why she was requesting Dunn's bank statements. The TAC accuses Brettman of misleading Bellucci-Maus regarding Brettman's interactions with Dunn. And the TAC contends that "[a]s a result of Ms. Brettman's fraudulent actions, Mr. Dunn was falsely accused of tortious interference." TAC ¶ 293. Count 27 recasts count 10 as an aiding-and-abetting claim. Counts 14, 15, and 40 assert that Wells Fargo is vicariously liable for Dunn's purportedly fraudulent conduct.

Common law fraud in Connecticut is proven by satisfying four elements: "(1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon that false representation to his injury." *Sturm v. Harb Dev., LLC*, 298 Conn. 124, 142 (2010). Even accepting as true Dunn's claim that Brettman misrepresented her

intentions when she asked Dunn to provide 12 months of bank statements, Dunn has not plausibly suggested that this falsehood induced him to act upon that falsehood to his injury. Instead, Dunn reacted to Brettman's outreach by refusing to provide his bank statements until he received written assurances (as well as the confirmation from Brettman's supervisor) that the statements would not be shared with Bellucci-Maus. TAC ¶¶ 192-97. Nor has Dunn plausibly asserted that Brettman sought to induce any action—let alone an injurious action— by uttering these purportedly false statements regarding her interactions with Dunn.

Accordingly, counts 10, 14, 15, 27, and 40 are also dismissed with prejudice and without leave to amend.

### D.    Negligent and Intentional Infliction of Emotional Distress

Counts 35-39 seek damages on the basis that Defendants committed the torts of intentional infliction of emotional distress (IIED) or negligent infliction of emotional distress (NIED). Count 35 is asserted directly against Bellucci-Maus, Cartier, and Brettman. Counts 36-39 allege that Defendants conspired, aided and abetted, or are vicariously liable for causing emotional distress. The TAC focuses specifically on Bellucci-Maus's contention in the Superior Court that Dunn forged her signature on the 2015 Agreement. TAC ¶¶ 471. The TAC also submits that Cartier and Brettman caused Dunn emotional distress by misrepresenting other key facts in their testimony in the Superior Court action. *See id.* ¶¶ 472-75.

Bellucci-Maus does not respond to the contention that she is liable for negligent and/or intentional infliction of emotional distress for her statements and omissions during the 2018 meeting before a family relations officer and the Superior Court proceedings. *See* Bellucci-

Maus's Mem. 10-18.[10] Nonetheless, those statements are immunized by Connecticut's litigation privilege. The Connecticut Supreme Court has "recognized that absolute immunity extends to an array of retaliatory civil actions beyond claims of defamation, including intentional interference with contractual or beneficial relations arising from statements made during a civil action, intentional infliction of emotional distress arising from statements made during judicial proceedings, and fraud against attorneys or party opponents for their actions during litigation." *Dorfman v. Smith*, 342 Conn. 582, 592 (2022).[11]

Dunn also asserts that Bellucci-Maus is liable for baselessly suggesting to their son at some indeterminate point in the past that Dunn "had been physically violent." TAC ¶ 471. Dunn says "upon information and belief" that Bellucci-Maus admitted in her deposition in the Superior Court action that she "might have" previously suggested to their son that Dunn "had been physically violent with her, even though at the same time she emphatically testified that no physical violence ever occurred between them." *Id.* ¶¶ 213-14. "To state a claim of negligent infliction of distress, a plaintiff must plead that (1) the defendant's conduct created an

---

[10] It is well settled that a "district court has the power to dismiss a complaint sua sponte for failure to state a claim." *Leonhard v. United States*, 633 F.2d 599, 609 n.11 (2d Cir. 1980). And there is a widespread practice in the Second Circuit of courts dismissing individual claims sua sponte where "there is no substantial question as to whether the plaintiff can prevail." *Choi v. 37 Parsons Realty LLC*, 642 F. Supp. 3d 329, 335 (E.D.N.Y. 2022) (collecting cases).

[11] To the extent Dunn seeks to recover based on Brettman's pre-suit comments to Bellucci-Maus regarding her interactions with Dunn, I find that this conduct fails to state a claim for NIED because Dunn has not pleaded that he suffered the level of extreme emotional distress required for NIED claims. I similarly find that the TAC fails to state a claim for IIED because it does not contain factual allegations that plausibly assert that Brettman engaged in "extreme and outrageous conduct" intended to inflict emotional distress on Dunn, or that Brettman should have known that such distress was likely to result. Indeed, it appears Dunn was distressed by the fact that Bellucci-Maus sued him—and it is implausible to suggest that Brettman intended or should have foreseen the suit and his resulting distress.

unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress." *Kleftogiannis v. Inline Plastics Corp.*, 411 F. Supp. 3d 216, 227 (D. Conn. 2019) (citation and internal quotation marks omitted). "To state a claim for intentional infliction of emotional distress, it must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that emotional distress sustained by the plaintiff was severe." *Ryder v. J.P. Morgan Chase Bank*, No. 3:13-CV-01929 (AVC), 2015 WL 13793263, at *12 (D. Conn. Aug. 19, 2015).

I do not doubt that Dunn suffered significant emotional distress from being estranged from his child. Nor do I question Dunn's contention that he was intensely upset by the prospect that his child had been misled into believing he had ever harmed Bellucci-Maus. But the TAC does not plausibly state a claim of NIED because it does not suggest that Dunn suffered the kind of intense upheaval rising to the level of illness or bodily harm required to support an NIED claim. *Cf. Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 446-48 (2003) (affirming NIED judgment for plaintiff who had been accused of committing a criminal offense and, as a result of baseless investigation, suffered loss of sleep, loss of appetite, intense depression, and social isolation from his community). Nor does the TAC state a claim of IIED because its bare

recitation does not permit me to evaluate causation or Bellucci-Maus's intent.[12] I therefore dismiss the NIED and IIED claims premised on statements made by Bellucci-Maus about Dunn to their son without prejudice to filing an amended complaint.

But while Dunn may amend the complaint to provide greater clarity regarding his assertion that Bellucci-Maus is liable for statements she made to their son, all other NIED and IIED claims discussed here concerning statements by Brettman and Cartier are dismissed with prejudice.

### E.    Defamation

#### 1.    Claims Against Brettman and Wells Fargo

Count 33 asserts that Brettman defamed Dunn through her text messages to Bellucci-Maus regarding her interactions with Dunn. TAC ¶ 455. Claim 34 asserts that Wells Fargo is vicariously liable for Brettman's defamatory statement. *Id.* ¶¶ 464-69. Dunn focuses in particular on Brettman's statements that "Mr. Dunn tried to create problems for me," that Dunn was "not very pleasant," was "totally out of line," and was "trying to bully me." *Id.* ¶ 455. Brettman responds that these statements of opinion cannot give rise to a claim for defamation. Brettman & Wells Fargo's Mem. 20-22. "A defamatory statement is defined as a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. But it is not enough that the statement inflicts reputational harm. To be actionable, the statement in question

---

[12] Dunn does not state when Bellucci-Maus made these misstatements or when he learned about them. Depending on the timing of the statements, these claims may also be subject to the two-year bar for NIED and three-year time bar for IIED. Conn. Gen. Stat. § 52-584; *see also Spencer v. Connecticut*, 560 F. Supp. 2d 153, 163 (D. Conn. 2008) (stating the relevant limitations periods for IIED and NIED).

must convey an objective fact, as generally, a defendant cannot be held liable for expressing a mere opinion." *NetScout Systems, Inc. v. Gartner, Inc.*, 334 Conn. 396, 410 (2020) (citations and internal quotation marks omitted). The Connecticut Supreme Court has identified several factors a court should consider in analyzing whether a statement expressed an opinion or instead purported to convey an objective fact. These include "(1) whether the general tenor of the entire work negates the impression that the defendant was asserting an objective fact, (2) whether the defendant used figurative or hyperbolic language that negates that impression, and (3) whether the statement in question is susceptible of being proved true or false." *Id.* at 413 (citation omitted).

I agree that the context reveals that Brettman was expressing her opinion. She described Dunn's personality in terms that are not susceptible to being disproven. TAC ¶ 455 ("He's not very pleasant."). At no point did she purport to report on an objective fact beyond speculating as to Dunn's earning potential. *Id.* ¶ 201 (Brettman stating that Bellucci-Maus should "refinance those loans ASAP, as he makes enough income to do so"). The entire tenor of this interaction—a series of short text messages relaying an apparently unpleasant interaction with Dunn—negates the impression that Brettman was reporting objective facts concerning Dunn.

I therefore dismiss claims 33 and 34 with prejudice because I find that any further amendment with regard to these claims would be futile. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

### 2.    Claims Against Bellucci-Maus

Count 32 asserts that Bellucci-Maus defamed Dunn by including "baseless accusations in legal filings." TAC ¶ 444. I find that the litigation privilege immunizes Bellucci-Maus from suit for defamation for any statements made in the course of the Superior Court action.

*Dorfman v. Smith*, 342 Conn. 582, 592 (2022). Dunn separately claims that Bellucci-Maus defamed him by telling their son that Dunn was a "deadbeat" and "not a man." *Id.* ¶ 445. For the reasons stated above, these statements of opinion are plainly not grounds for a defamation claim.

Count 32 also includes an allegation that Bellucci-Maus misled their son into believing "that Mr. Dunn had been physically violent with her." *Id.* ¶ 445. Dunn says "upon information and belief" that Bellucci-Maus admitted in her deposition in the Superior Court action that she "might have" previously suggested to their son that Dunn "had been physically violent with her, even though at the same time she emphatically testified that no physical violence ever occurred between them." *Id.* ¶¶ 213-14. Dunn states upon information and belief that this false statement "led their son to believe that Mr. Dunn had committed criminal acts." *Id.* ¶ 445.

"Defamation is comprised of the torts of libel and slander: slander is oral defamation and libel is written defamation." *Skakel v. Grace*, 5 F. Supp. 3d 199, 206 (D. Conn. 2014). "To establish a prima facie case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." *Gambardella v. Apple Health Care, Inc.*, 291 Conn. 620, 627-28 (Conn. 2009). Connecticut courts have stressed that a defendant accused of defamation must have fair notice of purportedly defamatory statements.[13] *Stevens v. Helming*, 163 Conn. App. 241, 247 n.3 (2016); *A Better Way*

---

[13] The Connecticut Supreme and Appellate Courts have not squarely held that every claim for defamation must be pleaded with particularity. *Stevens v. Khalily*, 220 Conn. App. 634, 644, *cert. denied*, 348 Conn. 915 (2023) (noting that the court's discussion of the importance of heightened

*Wholesale Autos, Inc. v. Better Bus. Bureau of Conn.*, No. UWYCV146025379S, 2021 WL 5112673, at *3 (Conn. Super. Ct. Oct. 19, 2021), *aff'd*, 221 Conn. App. 1 (2023); *Chertkova v. Conn. General Life Ins. Co*., No. CV–98–0486346–S, 2002 WL 1902988, at *4 (Conn. Super. Ct. July 12, 2002) ("A claim of libel must be pled with specificity, as the precise meaning and choice of words employed is a crucial factor in any evaluation of falsity. The allegations should set forth facts sufficient to apprise the defendant of the claim made against him. A complaint for defamation must, on its face, specifically identify what allegedly defamatory statements were made, by whom, and to whom.") (quoting 50 Am.Jur.2d, Libel and Slander, § 434) *aff'd*, 76 Conn. App. 907 (2003); *Kloth v. Citibank (S. Dakota), N.A.*, 33 F. Supp. 2d 115, 121 (D. Conn. 1998) (same). Beyond affording fair notice to a defendant, detailed pleading of a defamation claim also helps a court evaluate from the context in which a statement is published whether it is best understood as a statement of fact or opinion. *See Murphy v. Rosen*, 351 Conn. 120, 132 (2025). Detailed pleading also informs the degree of evidence required to support a plaintiff's claim of reputational injury. *See Stevens v. Khalily*, 220 Conn. App. 634, 646-47, *cert. denied*, 348 Conn. 915 (2023) (describing different pleading requirements based on type of reputational harm alleged).

But nowhere within the 500-paragraph TAC is there any assertion regarding when Bellucci-Maus made these defamatory statements or indeed a description of what it is specifically that Bellucci-Maus said to their son. It is thus unclear whether Dunn is required to

---

pleading requirements in *Helming*, 163 Conn. App. at 247, was not essential to its holding). I nonetheless find the discussion *Helming*, as well as the Superior Court cases cited above, persuasive and relevant to this case, particularly where, as here, an otherwise prolix complaint is largely bereft of allegations to support a claim of slander.

plead facts supporting reputational harm. *See Khalily*, 220 Conn. App. at 646 ("Whether a party must expressly allege facts sufficient to prove the last common-law element of defamation, reputational harm, turns on the type of defamation asserted, defamation per se or defamation per quod."); *id.* at 646 (stating that "statements that accuse a party of a crime involving moral turpitude or to which an infamous penalty is attached" are defamation per se). In sum, the allegations here are too vague to put Bellucci-Maus adequately on notice of the claims she must defend. I therefore dismiss count 32 without prejudice to the filing of an amended complaint describing any non-privileged purportedly defamatory statements made by Bellucci-Maus.

### F.    Intrusion Upon Seclusion

Count 28 asserts that Brettman is liable for invasion of privacy. TAC ¶¶ 415-20. Counts 29 and 31 assert that Wells Fargo is vicariously liable for Brettman's misconduct. *Id.* ¶¶ 421-26. And Claim 30 alleges that Bellucci-Maus, Brettman, and Cartier conspired to invade Dunn's privacy. TAC ¶¶ 427-36. Dunn asserts that "Brettman intentionally sought to obtain Mr. Dunn's private financial information under false pretenses, knowing that she was not authorized to access or use this information in the manner she did." *Id.* ¶ 417. He claims that Brettman "had visibility into how much money Mr. Dunn had in his account" even though "Brettman was not given access to Mr. Dunn's bank account." *Id.* ¶ 202. As evidence of this purported intrusion, Dunn points to Brettman's later statement to Bellucci-Maus that Bellucci-Maus should "refinance those loans ASAP, as he makes enough income to do so." *Id.* ¶ 201.

"[T]o establish a claim for intrusion upon the seclusion of another, a plaintiff must prove three elements: (1) an intentional intrusion, physical or otherwise, (2) upon the plaintiff's solitude or seclusion or private affairs or concerns, (3) which would be highly offensive to a

reasonable person." *Parnoff v. Aquarion Water Co. of Conn.*, 188 Conn. App. 153, 172-73 (2019). Dunn does not include any non-conclusory allegation that Brettman ever had access to his account. Instead, the TAC depicts how Dunn rebuffed Brettman's attempts to review his bank statements in the course of considering Bellucci-Maus's loan application. TAC ¶¶ 181-202. Even liberally construed, Brettman's statement that Dunn had a high earning potential does not support the inference that Brettman ever had access to Dunn's finances. After Dunn consistently refused to provide his bank statements, Bellucci-Maus's application to refinance was denied, which makes it implausible that Brettman secured improper access to Dunn's financial records.

Because the direct theory of liability fails to state a claim, claims 29 and 30 necessarily fail to state a claim of conspiracy or vicarious liability. I find that further amendment would be futile with regard to these claims and so dismiss claims 28, 29, 30, and 31 with prejudice. *Cuoco*, 222 F.3d at 112.

### G.    Leave to Amend

Dunn moved for leave to file a Fourth Amended Complaint on August 5, 2025. Dunn sought leave to (1) add additional factual allegations to counts 7 and 8 for abuse of process; (2) add additional factual allegations to counts 9-11 for fraud; (3) brings three new counts for abuse of process against Cartier and a new defendant, Cartier & Bower LLC; and (4) asserts a novel claim that Crosby, Bellucci-Maus, and Cartier are liable for "fraud on the court." All Defendants timely responded in opposition to these amendments.

The Second Circuit has clarified that there are three different standards that govern attempts to amend pleadings, which correspond to different time periods in the litigation.

> At the outset of the litigation, a plaintiff may freely amend her pleadings pursuant to Rule 15(a)(1) as of right without court permission. After that period ends—either upon expiration of a specified period in a scheduling order or upon expiration of the default period set forth in Rule 15(a)(1)(A)—the plaintiff must move the court for leave to amend, but the court should grant such leave "freely . . . when justice so requires" pursuant to Rule 15(a)(2). This is a "liberal" and "permissive" standard, and the only "grounds on which denial of leave to amend has long been held proper" are upon a showing of "undue delay, bad faith, dilatory motive, [or] futility." The period of "liberal" amendment ends if the district court issues a scheduling order setting a date after which no amendment will be permitted. It is still possible for the plaintiff to amend the complaint after such a deadline, but the plaintiff may do so only up a showing of the "good cause" that is required to modify a scheduling order under Rule 16(b)(4).

*Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 115 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 1112 (2022) (citations omitted).

The parties dispute whether Dunn's motion to amend is subject to Fed. R. Civ. P. 15(a)(2) or 16(b)(4). I agree that Dunn's Motion to Amend, filed nearly a year after the date set by the Court when no further amendments would be permitted, is subject to Fed. R. Civ. P. 16(b)(4). *See* ECF No. 35. Although Magistrate Judge Richardson's scheduling order envisioned that the parties could amend the pleadings in response to a ruling on Defendants' Motion to Dismiss, it did not purport to vacate or modify Chief Judge Shea's Order setting forth a deadline when no further amendments would be permitted. ECF No. 59.

On a motion to amend subject to Fed. R. Civ. P. 16(b)(4), the burden rests on the moving party to state good cause for amending after the deadline set in the scheduling order. *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000). Although Dunn asserts that his delay is excused by factual developments relating to grievance proceedings he instigated against Crosby and Cartier, the novel cause of action relates entirely to facts that were knowable at the time that Dunn brought the present action. Dunn has failed to state good cause for waiting nearly a year to assert a novel cause of action in the form of "fraud on the

court," which in any case is duplicative of his claims for vexatious litigation. I therefore decline to permit Dunn to assert a new cause of action against additional defendants. I also find that Dunn has not shown good cause to amend or plead new causes of action alleging fraud and abuse of process. I note also that these additional allegations regarding abuse of process and fraud described in the proposed Fourth Amended Complaint are futile in that they fail to remedy any of the substantial defects with both causes of action identified in this Opinion.

Nonetheless, I will exercise my discretion to permit Dunn to amend the claims of vexatious litigation, IIED and NIED, and defamation to remedy the deficiencies identified in this Opinion. Dunn may not assert novel theories of recovery or seek to join defendants not named in the TAC. The Fourth Amended Complaint shall adhere strictly to Rule 8's requirement that "[e]ach allegation must be simple, concise, and direct." Fed. R. Civ. P. 8(d)(1). I will strike the Fourth Amended Complaint if I determine that doing so is the only way to mitigate the burden on the court and on Dunn's adversaries of responding to an already prolix pleading. *See Salahuddin*, 851 F.2d at 42.

Dunn shall file his Fourth Amended Complaint on or before October 31, 2025. He shall include as an exhibit a redline version of the Amended Complaint that tracks changes between the Third and Fourth Amended Complaint. *See* D. Conn. L. Civ. R. 7(f)(2).

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motions to Dismiss are granted in part and denied in part. Plaintiff's Motion to Amend is denied. As all causes of action brought against Defendants Brettman and Wells Fargo have been dismissed with prejudice, the Clerk is respectfully directed to terminate Brettman and Wells Fargo from the action.

The Scheduling Order governing this action, ECF No. 59, is modified as follows: Plaintiff shall file an Amended Complaint consistent with the instructions in this Opinion on or before October 31, 2025. No further amendments will be permitted after that date. Defendants shall respond to the Amended Complaint on or before November 21, 2025 or move for an extension of time. Once Plaintiff files an Amended Complaint, the court will convene a scheduling conference with all remaining parties to this action to review discovery deadlines. No party may take discovery until after that scheduling conference.

**SO ORDERED.**

New Haven, Connecticut
September 22, 2025

/s/*Sarah F. Russell*
SARAH F. RUSSELL
United States District Judge

36